## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 23-CR-432 (RBW)** |
| **XYAN CLARY,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Xyan Clary,  through his attorney,  Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), respectfully submits this memorandum to aid the Court at sentencing and hereby notifies the Court that she has received and reviewed the final Presentence Report ("PSR") prepared in this case.   *See* ECF No. 48. After carefully reviewing the final PSR with Mr. Clary, the defense  has no objections to the PSR. For the reasons set forth herein, Mr. Clary requests that this Honorable Court impose a sentence of a period of home confinement, 120  hours of community service, one year of supervised release  and $500 restitution to account for:

1.     His lack of need for incarceration,

2.     His long history of compliance with the law;

3.     His strong work ethic and volunteerism which has allowed him to be a productive member of society;

1

4.       His young age[1], his lack of preparation or planning prior to January

6, 2021 to be part of the Capitol breach and his  non-destructive and

non-violent behavior that day both outside and inside the Capitol

building;

5.       His willingness to assist  law enforcement in his case; and

6.       His sincere remorse.

## I.    **Background**

Mr. Clary comes before the Court having pled guilty to a class A

misdemeanor offense of Entering and Remaining in a Restricted Building, in

violation of 18 USC § 1752(a)(1).  His base offense level is a 2-the lowest

undersigned counsel has ever  had in her career, with a guideline range of 0-6

months.  At the outset, undersigned counsel wants the Court to know what a

pleasure it has been working with AUSA Dreher to resolve this case.

---

[1] See *Miller v. Alabama*, 567 U.S. 460 (2012)( The United States Supreme Court held it unconstitutional to impose a mandatory sentence of life without parole on children because such a sentence fails to adequately account for a child's developmental stage or ability to weigh long-term consequences. Children are fundamentally different from adults, making them more susceptible to lack of self-regulation, poor decision making, and peer pressure. In *Miller*, the Court found that these aspects of children's behavior made children less culpable than adults. Specifically, the Court held that science proves a young man's brain is not fully formed until the age of 25. This malleability  of the brain often results in changes in behavior, unanticipated reactions, and poor decision making in these individuals. However, scientific findings support the contention that this same malleability allows adolescents to rehabilitate, making a case for rapid positive change.)*.*

Mr. Clary is a kind, smart, young man-21 years old at the time of this offense who went to the Capitol with his mom. He made a terrible mistake-one that does not merit a sentence of incarceration. Rather, as the Court's complete sentencing history shows, this Court should mete out a punishment commensurate with the behavior of Mr. Clary compared to other rioters that day. He followed his mother into and out of the building, he did not cause any damage, nor did he engage in violence or encourage violence. Mr. Clary has always accepted responsibility for his actions on that horrible day. When this Court considers the behavior of other criminal defendants charged with crimes stemming from January 6, 2021, the Court will find that Mr. Clary does deserve to be punished, but does not deserve a sentence that includes incarceration.

A. **Media reports of stolen election**

After the presidential election, Donald Trump (hereinafter "Trump") and his inner circle began spreading the word that the election was "stolen" from him by Democrats and others. https://www.washingtonpost.com/politics/trump-election-voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html. This was a lie and he refused to concede. False claims were made on media sources, as well as by the President himself, that the election system had been corrupted and that the integrity of the election should be questioned.

Amazingly, Trumps willingness to undermine confidence in the democratic process infected millions of his supporters and they were convinced that the loser was actually the winner. Now we know that before the January 6th riot, Trump White House officials strategized about a plan to direct thousands of angry marchers to the Capitol Building. On the planning call were Mark Meadows, the White House chief of staff, Rudy Guliani, Mr. Trump's personal lawyer, and Representative Jim Jordan, Republican of Ohio, among others. Now we know the "stop the steal" rally at the Ellipse was not accidental but a well-planned scheme urging the crowd to violence.  According to Representative Liz Cheney,  Vice Chair of the House Select Committee investigating January 6, "President Trump invested millions of dollars of campaign funds purposely spreading false information, running ads he knew were false, and convincing millions of Americans that the election was corrupt and that he was the true President." *See* https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript.

According to a Washington Post Article from June 13, 2022, many in President Trump's inner circle, including  his White House Counsel, informed President Trump that there was no basis for overturning the election results but that President Trump ignored those voices.  While most of these high profile lawyers and advisers to the President testified to the January 6th committee that they told the President personally the facts about the election results and their discomfort

with his claims that the election had been stolen, most did not "correct the public record on the issue or speak out against Trump's false claims."

https://www.washingtonpost.com/national-security/2022/06/13/jan-6-committee-hearings-live/ When these high level government advisors  failed to timely correct the narrative, it left a huge informational void that was filled with the likes of conspiracy theorists, online extremists and Trump loyalists willing to manipulate public opinion for their own purposes. And the President himself added fuel to the fire by declaring that he was trying to actually protect the democratic process.[2] People like Mr. Clary stood no chance at truly grasping the gravity or reality of the situation, let alone know what the facts truly were before January 6, 2021.

This Court can only understand why Mr. Clary  came from Tennessee to D.C. to attend the Trump Rally by taking into account the enormous influence the President, the media, and the lack of accurate and truthful information played in the months leading up to January 6, 2021.   He came with his mother because he wanted to see President Trump speak.  While consumption of media news is no excuse for bad behavior, it does demonstrate the powerful impact news stories, fake or real, have on the citizens of this country, not just  a young man like Mr.

---

[2] On January 4th, 2021 at 10:07 a.m. EST Donald Trump tweeted: "How can you certify an election when the numbers being certified are verifiably WRONG. You will see the real numbers tonight during my speech, but especially on JANUARY 6th…" https://www.presidency.ucsb.edu/documents/tweets-january-4-2021 (last visited August 28, 2022).

Clary.  The media sets the tenor for how people feel about their rights and freedoms and can also plant notions (often false) of discontent or even outrage.

We have now learned through the Congressional hearings that have taken place and through other investigative reports, such as the one from the New York Times linked herein, that there were two types of protestors in the crowd on January 6th.  https://www.nytimes.com/2022/06/17/us/politics/proud-boys-jan-6.html  There were ones initially who waited outside barricades and peacefully assembled with the initial intent just to exercise their First Amendment rights and others there with a pre-determined plan  to incite the crowd and to breach the Capitol building.  The regular folks, like Mr. Clary, were referred to by some of the planners, including the Proud Boys, as the "normies."  The "normies" were used as unwitting pawns in the plans of the Proud Boys and others that day.



*Id.* The plan depended on  creating chaos and whipping up the "normies" into a patriotic frenzy.   The groundwork for this frenzy had been laid in the weeks before

January 6th by President Trump's propaganda about election fraud and had been fueled by President Trump himself at the rally on the mall.  The Proud Boys intended to use the large crowd to distract and overwhelm as they went to the work of breaking into the Capitol.[3]

Mr. Clary had no idea he (and his mother) was being used as a pawn in a game far more sophisticated and complex than anyone could imagine, especially him. And to his credit, he didn't get whipped up at all. Consider that it took the January 6th House Select Committee more than a 1000 individual interviews and nearly 2 years  of investigation, to parse through to what they believe is just some of the truth about what transpired that day.   How could Mr. Clary, or any "normie" that day have known what was to happen?   He came to DC to see President Trump speak. His intent was clear. He did not suit up for combat.  He did not obscure his face.  He was not armed.  He wore street clothing. He carried a flag.  He came with his mom, not as part of an organized group.  Mr. Clary committed no violent actions.  He did not destroy anything.  Unfortunately, he now understands that

---

[3] In a past sentencing, Judge Mehta told one J6 defendant "There is some mitigation here.  The defendant didn't plan this episode, he didn't purposely come to Washington, D.C. , to storm the Capitol. The fact remains that he and others were called to Washington, D.C., by an elected official, told to walk to the Capitol by and elected official…People were told lies, falsehoods, told the election was stolen when it really wasn't…I think you are a pawn…You are a pawn in a game that's played and directed by people who should know better. *See* Steve Benen, *Judge blames Jan. 6 on Trump, tells rioter he was 'a pawn'*, MSNBC (Nov. 22, 2021), available at https://www.msnbc.com/rachel-maddow-show/judge-blames-jan-6-trump-tells-rioter-he-was-pawn-n1284327.
_

going into the Capitol that day was not the right thing to do and he deeply regrets his actions.

## II.     THE TRIP TO THE CAPITOL AND JANUARY 6, 2021

### A.  Mr. Clary's trip to D.C. and his walk to the Capitol

Mr. Clary did not come to DC thinking he was going to the Capitol, let alone inside the Capitol. Not until Trump's speech did he have any intention of  going anywhere other than the Ellipse area.   Now, after seeing what really happened that day by watching film with his lawyer,  Mr. Clary deeply regrets going into the Capitol. He walked to the Capitol with his mother, no one else.

### B.  Mr. Clary's limited activities inside and outside the Capitol.

For some time, police were able to fend off the crowd, but as we now know, some rioters instigated a push to overwhelm the few, undertrained, under equipped and unprepared police.[4] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side

---

[4] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

of the building. This was several minutes before Mr. Clary actually entered the Capitol.  Hundreds preceded him in entering the Capitol.

At 2:13 pm someone, not anyone Mr. Clary knew or saw, breached the Senate Wing Entrance window on the right hand  side.  Others then jumped in and broke the doors open.

Many people crowded around the Senate Wing Doors during this crucial time period.   By the time Mr. Clary  reached the  area people had already started to flood into the Capitol through the doors and a broken window.

Mr. Clary had no idea how the door was opened or who opened it.   He had not seen the first steps taken to open the doors only that people were going in when he got there.  Though many others were violent, breaking the windows, pushing officers, etc., Mr. Clary  was not violent.  He also believed President Trump would be there at the Capital, as he had told the crowd.   Once inside the Capitol, his actions were peaceful.  He milled around the senate wing door hallway for a total of six minutes. When he saw police ushering other rioters out the broken window, he believed that he should go and he did. He was there for 6 minutes in one area.

Mr. Clary has absolutely no history of political extremism.   In fact, he expected only to attend the rally called by the President of the United States.   He had absolutely no expectation that there would be violence or destruction.

He fully acknowledges that he never should have entered the Capitol.  While he did not personally destroy anything, he  played a part in an unmanageable mob. There is no evidence that he sought to stop any official proceeding or understood what was actually happening.

He has no record of any similar behavior, and there is no reason to think he would ever follow a mob in the future. Mr. Clary never imagined going inside the Capitol and certainly never thought that violence and destruction would follow.

## III.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in

the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets

forth the factors that the Court must consider in fulfilling this provision.[5]

## V.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but

not greater than necessary" in light of the factors identified in §3553(a).    *United*

*States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough*

*v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. Nature & Circumstances of the Offense & the History and Characteristics of Mr. Clary

First, the defense is not aware of any evidence that defendant's entry into the

Capitol was violent in any way.  Second,  he did not engage with others while in

the Capitol.  Third, there is no evidence that he engaged in any violence or

questionable conduct towards law enforcement Fourth,  based on the

Government's investigation, it appears that he was cooperative with the agents and

remained in the Capitol building for a limited period of time, around 30 minutes.

---

[5] 1.   The nature and circumstances of the offense and the history and characteristics of the defendant;
2.   The need for the sentence imposed;
3.    The kinds of sentences available;
4.   The kinds of sentence and the sentencing range…;
5.    Any pertinent policy statements issued by the Sentencing Commission;
6.   The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.   The need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a)(1-7).

The government must concede that he committed no violent acts and destroyed no property. His actions within the Capitol have been tracked on  CCTV footage and this demonstrates that he did not destroy property or commit violent acts.   And when he spoke to police officers, it was non-confrontational and respectful.  He did not suit up for combat.  He did not obscure his face.  He was not armed.  He did not yell at any police officers. He wore street clothes.

Mr. Clary lives at home with his mother and did so at the time of this offense and will continue to live with his mother after sentencing. This has obviously been a tough road for Mr. Clary, made even tougher by the loss of his father when he was a young boy.  He has a very simple life: he works hard, attends college when he can, does volunteer work and tries at every turn to improve himself. None of his actions will be erased from the internet. It's there forever.   He has fully accepted responsibility for his bad judgement in entering the Capitol building.  He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021 for violent purposes. His personal character and reputation will forever be tarnished and he now has a federal conviction.  What is great about Mr. Clary is that he has a great job and has been promoted to supervisor. He has been entrusted with the lives of other employees. He wants to continue his college courses which have been put on hold since this case started. A sentence of incarceration would erase years of progress.

Mr. Clary does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that he intended no harm, and was 21 years old when he committed the offense.  His recent past behavior and his post arrest behavior show that he is capable of being a very productive citizen and the Court can rely on that as a basis to sentence  him  to a term of  home confinement (which would allow him to work and go to school) considering the 3553 factors.

## B. Need for the Sentence imposed

### 1. General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be little  need for incapacitation, specific deterrence or rehabilitation. The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and destruction at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work, to church and   to school when other reasonable alternatives exist would not  and do not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are

likely to be counterproductive, and labeled as political posturing by those who

know no better.  A sentence of probation or home confinement, restitution, and

community service  constitute punishment  and  it will deter others as one's liberty

interests are curtailed by travel restrictions, reporting obligations, and limitations

on one's personal freedoms. Mr. Clary  has been on pretrial release for over a year

with many restrictions.  The National Institute of Justice, Department of Justice,

issued a summary of the current state of empirical research stating that "prison

sentences are unlikely to deter future crime," and "increasing the severity of

punishment does little to deter crime."  U.S. Dep't of Justice, Office of Justice

Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July

2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42

Crime & Justice in America 199 (2013)), available at

https://ncjrs.gov/pdffiles1/njj/247350.pdf.

Additionally, Mr. Clary will come away from this case, regardless of the

sentence imposed, with a federal conviction. As Judge Chutkan  has noted in

another  non-J6 case, individuals with felony federal convictions:

. . . frequently encounter barriers to employment, such as difficulty obtaining certain professional
licenses, as well as other collateral consequences. Indeed, scholars and legislative associations
have written extensively about this problem—and possible solutions. However, absent statutory
authority, [courts have] limited power to expunge criminal convictions, and the broader problem

of undue collateral consequences remains an issue to be addressed by the legislative branch, if and when they choose to do so.[6]

Sentencing Mr. Clary  to incarceration is not the salve the country needs to ensure January 6 was an isolated horror. Those that would participate in this type of behavior will not be deterred by the prison sentence of an obscure 21-year-old from Tennessee. Further, even if future, hypothetical insurrectionists were capable of deductive reasoning, empirical evidence proves that *certainty* of prosecution, rather than *severity* of punishment, is the greater deterrent:

[I]t is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.[7]

## 2. Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

Mr. Clary's  likelihood of recidivism is really non-existent. He has expressed genuine remorse and contrition.  His acceptance of responsibility was swift, complete and without reservation.[8]  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent

---

[6] *See United States v. Shelia Denise Graham*, Crim No. 85-cr-186, ECF No. 6.

[7] *See* National Institute of Justice, *Five Things About Deterrence* (Jun. 5, 2016), available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence#:~:text=Certainty%20has%20a%20greater%20impact,only%20a%20limited%20deterrent%20effect.

[8] Unlike many other J6 defendants, he has not denied his behavior, gone on the TV and the podcast circuit to propagate  "The Big Lie."

effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just.

1, 28 (2006)" Three National Academy of Science panels… reached that

conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay,

*Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and*

*Sentence Severity: An Analysis of Recent Research (1999),* summary available at

http://members.lycos.co.uk/lawnet/SENTENCE.PDF.[9] Given Mr. Clary's   current

age (24) and other issues consistent with what is mentioned above, the likelihood

that he would ever re-offend is as close to zero as one might come. A punishment

of any jail time in this case is going to have the exact opposite effect than what is

in the interest of justice.  The alternatives to incarceration make financial sense,

conserve bed space for individuals from which society would need greater

protection and would serve the ends of justice.  As a young man just starting his

life, being marked with a  scarlet letter will not help him succeed. The addition and

trauma of a custodial sentence will only further act as a barrier to productivity. His

own regret, his family's shame, and his federal conviction with supervision, are

---

[9] The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.

enough; Mr. Clary needs no further specific deterrence. In other words, Mr. Clary, just by virtue of this case, has taken it upon himself to better his life.

### C.  The kinds of sentences available

A sentence of incarceration would result in sentencing disparity with other individuals who behaved similarly but were not similarly charged . *See infra*.[10] It will also create a disparity of similarly charged and convicted defendants. *See infra*. Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case.  Defendant's personal financial condition is modest as outlined in the PSR and he respectfully submits that he cannot pay any fine.   Home confinement involves significant restraints on a defendant's liberty. Defendants must periodically report to the probation officer, permit the officer to visit their homes and jobs at any time, and follow the officer's advice.  *Jones v. Cunningham,* 371 US 236, 242 (1963).  Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives.  *Ibid*.  Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison.  *Ibid*.

---

[10] This does not include every case, just a sampling of some of the cases that have come before the Court.

17

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation. *Ibid*. They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime. *Ibid*. Probation significantly restrains defendants' liberty to do the things that free people in this country are entitled to do. *Ibid*.

**D. The need to avoid unwarranted sentence disparities**

If this Court were to impose a sentence greater than home confinement, probation, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing or are pending in this Court.

What's so disparate are cases where defendants were allowed to plead to class B and class A misdemeanors in J6 cases where their conduct was much worse than Mr. Clary's.[11] The case closest to the instant case that this Court

---

[11] The following cases are a sampling where a class B misdemeanor was charged and pled to and resulted in little to no incarceration with facts that often were more egregious than Mr. Clary's:
**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement even though Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, 3) called for a revolution even after the events of January 6, 4) encouraged the rioters to be proud of their actions, and 5) minimized the impact of that day on lawmakers and democracy. Judge Hogan imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of

home confinement for Mr. Bustle. The government recommended probation in this case.

** *United States v. Reeder*, 21 CR 166 (TFH). Critically, this J6 defendant pushed police officers and made contact with them yet the government chose not to pursue those charges and he was given 3 months incarceration and allowed to keep his class B misdemeanor deal. Here's what he posted: "was there for over a half hour. I got gassed several times inside, many times outside the Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police inside. It was crazy. Absolutely insane." *See* ECF No. 26, p.1. Later a group unaffiliated with the government brought to their attention additional violent conduct by Mr. Reeder, and the government asked to continue the sentencing hearing. Ultimately, despite concrete evidence of violence, the government chose not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages 30-41.

Where a defendant pled to a class A misdemeanor charge:

Where a defendant pled to a class A misdemeanor charge:

**United States v. Jenny Louise Cudd*, 21-cr-00068 (TFM) (sentenced to 2 months probation)(defendant wore a bullet proof sweatshirt, engaged in a push against law enforcement officers while yelling "go" and "charge" and celebrated property destruction and lacked remorse) *See* ECF 90.

**United States v. Jennifer Ryan* 21-cr-00050(CRC)(sentenced to 2 months incarceration)(the defendant posted and live streamed her activity; she was "publicly cheerleading on a violent attack"(See ECF 48); she said the events were "a prelude to war" she shouted "fight for Trump" and "Hang Mike Pence"; she tweeted a photograph of a broken window that encouraged additional violence and she had no remorse;

**United States v. Scirica*, 21-cr-000457 (CRC) (sentenced to 15 days incarceration). Here, remarkably, the defense agreed with the government's 15 day recommendation of incarceration. The defendant was not remorseful, close to chamber where vote took place, close to police line, chanted USA at police, and directed the crowd inside the capitol. He also took photos and video of himself. *See* ECF 17.

**United States v.  Courtright*, 21-cr-00072 (CRC) (sentenced to 30 days incarceration)(the defendant went onto the Senate floor; picked up a "members only" sign and only returned it because an officer ordered her to; posted on social media that showed a complete lack of remorse; and chanted at a line of police officers "whose house, our house and USA, USA.").

presided over is *U.S. v. Carol Kieniski*, 22 CR 61(RBW). Her conduct was much

worse than Mr. Clary's and his mother's.  This Court sentenced Ms. Kiensiski to

20 days incarceration for the following conduct:

The defendant flew to Washington, D.C. from Tampa, Florida on January 5, 2021. 9. On January 6, 2021, at approximately 2:21 pm, the defendant and co-defendant Jon Heneghan entered the U.S. Capitol through the Senate Wing door which had been previously breached by other rioters approximately ten minutes earlier. 10. Approximately 30 seconds after entering, the defendants exited the Capitol Building through the Senate Wing door. Approximately one minute later, defendants reentered the building again through the Senate Wing door. The Senate Wing Door alarm was blaring loudly at the time defendants entered the building.  After entering the U.S. Capitol, defendants traveled down the hallway and walked through the Crypt. Defendants then proceeded to the second floor with the mob where they entered the Speaker's Office in the Speaker's Suite and hallways near Room 227. Defendants left the Speaker's Office Suite and proceeded to the Rotunda where they remained for several minutes taking pictures before exiting the building through the East Rotunda door at approximately 2:41 p.m. 12. While Kicinski was in the U.S. Capitol building, she took at least one video on her cellular telephone. The video depicted the interior of the Speaker's Office. During the video, Kicinski pans the interior of the Speaker's Office while stating, "Oh my God! This is Nancy Pelosi's office! It looks like she left in a hurry. Oh my God. I would say that Americans are upset." Near the end of the video, other individuals can be heard yelling "SWAT! SWAT!" as Kicinski moves toward the door.
*See id.,* ECF No. 47.

This conduct is much worse in that she entered the Capitol not once, but twice,

went all the way to the Crypt, entered the Speaker's Office, and took video on her

cell phone.

As for cases undersigned counsel has had in this Court in the past couple of years,

this Court has varied downward on three distinct types of cases: U.S. v. Earl

Hamilton, 20-245 (RBW) a fraud case where the defendant plead to credit card

fraud involving misuse of funds from a non-profit, in this Court's words, "stealing

money from babies." Mr. Hamilton received a sentence of 30 days. U.S. v. Huwida

Fadl, 16-211 (RBW) a  complicated money laundering case where the client pled

guilty and received a year and a day; and U.S. v. Ken Watts, 22-164(RBW) where

the defendant pled guilty to drug offenses and he received a year and a day. After a

cursory review of the sentences this Court has imposed in J6 cases no matter what

the charge, this Court generally gives about half what the government

recommends, with a couple of exceptions. As explained below, every case is

different and undersigned counsel is not going to tell this Court what he already

knows about the defendants individually that have come before him and been

sentenced by him. Suffice it to say that this Court can rely on Mr. Clary being

obedient to each and every order of this Court.

All told, the facts of the offense conduct and characteristics of the

defendants who garnered little or no incarceration  and were charged with only

misdemeanors were starkly different than Mr. Clary's conduct and characteristics.

His  culpability appears to be minimal in contrast with rioters who posted hateful

messages, destroyed  government property and assaulted or threatened the law

enforcement officers on that horrible day.  While Mr. Clary accepts  complete

responsibility for his actions, he was guided and urged every step of the way by no

less of an authority than the former President of the United States and a majority of

Republican Senators and Congressman that continued to repeat the 'Big Lie' that

the election had been stolen by the Democrats.

We might, and often tend to, look at that January day in all of its entirety.

We make judgments about the consequences of what that day meant for our

democracy, for our country. In this particular case, we are not looking and trying to understand a day or an event. Rather, we are trying to understand an individual and that individuals action. The mistake we are liable to make, and certainly the government is making in this case, is understanding the difference between January 6th as an event and, separately, Mr. Clary and his actions.

This mistake that I mention, which we are indeed liable to make is not uncommon in how we reason poorly. Consider how we think about sports games and their outcomes. There is a difference between the final score and the individual performances of that game. For instance, most people here are familiar with Washington D.C  football games. Imagine the Commanders have lost a game (which shouldn't be too hard to imagine). You see the final score and immediately you make assumptions about what led to the score and what probably happened as to why the Commanders lost. Without even watching the game, you derive conclusions about a game without seeing the performances. You might not have witnessed how great some players played and how poorly others played. Based on our previous experiences watching the Commanders and what other commentators and sports analysts have said about the team, we make all kinds of judgments about why the Commanders lost. The error here is that you are just looking at the box score, the general statistics. Passing yards, Interceptions, Touch downs, etc. Those stats don't tell the full story of the game and they certainly don't tell you how

certain individuals actually performed. Consider a quarterback hereinafter "QB" that throws an interception. On the box score you see the interception in the stats and might think the "QB" played poorly, when in reality, the ball was perfectly thrown and bounced off the wide receivers hands. Clearly, then, the wide receiver made the error, but what shows up on the box score is an interception by the QB. For all we know, the QB played a great game otherwise! I give you this example to illustrate that this is exactly the same mistake we make in understanding this case and Mr. Clary as an individual.

We have the tendency to look at January 6th like we look at the box score of a football game. We listen to reports of that day, the violence that happened, we see talking heads on news programs discuss the events of that day. Similarly to a football game, the box score doesn't tell the full story. Without understanding or even considering all of the evidence of this case and Mr. Clary's behavior, assumptions are made about his intent and thoughts just because he was at the Capitol that day. Rather than make assumptions about Mr. Clary because of what we know about January 6th and how horrible that day was, reason requires that we look at the particular actions of Mr. Clary to understand his actions and how much he individually contributed to the loss of January 6th, which is an enormous task for this Court, and what counsel has attempted to do here.[12]

---

[12] Mr. Clary will be reading a letter of apology at his sentencing and it will be filed on the public docket.

Finally, this Court should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; *through a door after many others had breached the Capitol* (2) whether the defendant encouraged violence; *absolutely not. He was a follower, not a leader.* (3) whether the defendant encouraged property destruction; *none* (4) the defendant's reaction to acts of violence or destruction; *he did his best  to get out of the  away from violence*  (5) whether during or after the riot, the defendant destroyed evidence; *none* (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; *Around 6 minutes total*; (7) the defendant's statements in person or on social media; *none on social media,* (8) whether the defendant cooperated with, or ignored commands from law enforcement officials;  *by all accounts he's been cooperative.* (9) whether the defendant demonstrated sincere remorse or contrition; and the defendant's conduct after January 6, 2021. *Yes, he has demonstrated remorse and has worked daily to do better.*  While these factors are not exhaustive nor dispositive, they help to place the defendant on a spectrum as to their fair and just punishment.

## VI. CONCLUSION

Considering all the applicable factors the Court will consider,  Mr. Clary respectfully moves this court to impose a sentence of a term of  home confinement or probation, 60 hours of community service,  and $500 restitution.  This sentence

is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Clary  as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,


By:      _____/s/_____
Kira Anne West
DC Bar No. 993523
712 H. St. N.E., Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com


CERTIFICATE OF SERVICE

I hereby certify on the 13th  day of June, 2024 a copy of same was delivered to the parties of record, by email  pursuant to the standing order and the  rules of the Clerk of Court.

_____*Kira West*_____/S/
Kira Anne West