UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America ) | |
| ) | |
| v.   ) | USDC No. 23-cr-432-02 (RBW) |
| ) | |
| Nico Clary, *defendant*.   ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant, through undersigned counsel Nathan I. Silver, II, Esq., appointed by this Court under the Criminal Justice Act, submits this memorandum to aid at sentencing on June 18, 2024 at 9 o'clock a.m. when she appears via videoteleconference (VTC) before the Court for her sentencing hearing.

The defendant entered a plea of guilty to a one-count criminal Information, which charged Entering and Remaining in a Restricted Building (Count One), in violation of 18 U.S.C. §1752(a)(1). In return for her guilty plea, the government agreed not to prosecute her for (b) Disorderly and Disruptive Conduct Which Impedes the Conduct of Government Business, in violation of 18 U.S.C. §1752(a)(2); (c) Disruptive Conduct in the Capitol Buildings, in violation of 40 U.S.C. 5104(e)(2)(D), and (d) Demonstrating, Picketing or Parading in a Capitol Building, in violation of 40 U.S.C. 5105(e)(2)(G) ("Demonstrating"), with which she was initially charged by complaint. She was released on her own recognizance, first at a Rule 5 proceeding in the U.S. District Court (ND Ohio), then at her in appearance in this Court , and has been in compliance with pretrial conditions since.

The defendant takes full responsibility for her conduct on January 6. She entered and remained on restricted Capitol grounds, when she should not have, then entered the Capitol and

remained for about six minutes, lingering in the area around her entranceway (the Senate Wing Door) but not straying into other parts of the Capitol. She and her son both entered the Capitol more than an hour after the breach of the building, and after much of the violent activity had concluded. She was one of many who acted non-violently while on the grounds (which were restricted) of the Capitol, and later the building itself. There was, of course, a riot ("a violent public disorder") but it was one she did not *personally* "create or engage in."[1] The presence of so many persons overwhelmed the ability of available law enforcement to keep order; in this sense, she, her son, and many others took advantage of the inability of officers to keep the sheer numbers of protesters (or even the merely curious) from the building. This made her crime not one of planning but of opportunity. She did not otherwise cause trouble to the officers who strove to keep order, and when told she had to leave the building, she did. The Court certainly is able – and required – to distinguish among the various levels of culpability for those who regrettably took part in the protest at the Capitol that day. The defendant was not a part of – nor did she encourage or approve – the melée or mayhem that others committed.

It was not to cause trouble that the defendant and her son came to Washington for the events of January 6. Indeed, she probably could not have anticipated that such an event – the breach and riot at the Capitol – would take place. Unhappily, though, once here, she and her son joined the crowd that went to the Capitol after the rally and speech they'd come here to attend. There, they were part of a very large crowd eager to see, hear, or show its support for the defeated president.[2] Many who later entered the Capitol had a mistaken belief that their conduct

---

[1] Definitions from Webster's Online Dictionary, noun and verb, respectively.

[2] The government notes that the defendant "approached the restricted grounds along Pennsylvania Avenue, N.W., where she took a position alongside her son atop the Peace Monument at around 2:00 p.m.…and spent

was protected by the First Amendment, which assures free speech, the airing of grievances, and peaceful assembly. But that Amendment, the cornerstone of our individual freedoms, does not protect those who attempt to exercise them in a restricted area.[3]  In other words, there can be reasonable limits placed on the exercise of those guaranteed rights.

The defendant is today a productive law-abiding citizen with such a dated criminal history that it has produced no criminal history points. (See Presentence Report ["PSR"] p. 12, ¶51)  Indeed, she qualified for the "Zero Point Offender" two-level reduction from her offense level under USSG §§4C1.1(a) and (b). (PSR, p. 9, §44)[4]

The defendant takes issue with several other contentions the Government makes in its memorandum ["Govt. Memo"] . (ECF Doc. 53, filed June 13, 2024)  First, it says its "recommendation" of 45 days incarceration is supported by the defendant's "bringing her son to participate with her."  It expands on this thesis: "One of the most important factors in Clary's case is that she brought – and encouraged – her son to take part in the riot. She climbed on the Peace Monument, she climbed on the balustrade, and she took photos of his actions. Her conduct as a parent was the wrong sort of encouragement."  (Govt. Memo., "The Nature and

---

approximately 24 minutes at this location until jumping down and walking closer to the Capitol."  (Govt. Memo, pages 3-4)  This may have shown a certain brashness and enthusiasm, but nothing riotous or even disrespectful.

[3] The defendant notes that the codefendant's sentencing memorandum (ECF Doc. 54) presents much material that would have equal application to the defendant's situation.  Though the defendant does not specifically incorporate by reference the points of that memorandum that apply equally to the two, the defendant will not reiterate those points, being satisfied that the information she seeks to bring to the Court's attention is before it.

[4] The government contends that an "upward variance is appropriate in the present case." because of the defendant's conviction from 1999, when at the age of 23 she was convicted of a "violent offense." Defendant asks the Court not to so find, as the information comes from the defendant's "NCIC record, which did not provide *any information* about the circumstances of the offense." This resulted in a sentence of 8 days of "periodic imprisonment" and five years probation. Her probation was terminated at the end of the five years. The defendant disputes that she was revoked on one of the probationary terms; for one, that probation also ended after five years, and "No additional information is available" about the circumstances. (PSR, page 12, ¶49) The age of this offense and the paucity of information, which the government has not augmented, should limit the weight this Court gives it.

Circumstances of the Offense," page 10)  Apart from sounding less like encouragement and more like behavior common to tourists, this strikes the reader as presumptuous, unsupported by actual evidence. One cannot conclude from what the evidence has or hasn't shown that the defendant was more responsible — simply as the codefendant's mother and, necessarily, elder – than her son.  The mother and son came to Washington together and attended the rally for former President Trump.  They wished to see Washington and hear Mr. Trump speak. That was certainly a benign purpose. Another factor the government cites was that defendant "climbed past other rioters[5] to make it to the Upper West Terrace."  Though she and her son went to the Capitol together, from time to time they would get separated, and she recalls having to look for and catch up with him if he got ahead of her.  Last, the government says that the "extended period of time" she was on the Upper West Terrace should also support its request for incarceration. The defendant acknowledges that she remained there for some time after leaving the building, but whether outside or inside, she neither acted violently nor showed resistance to lawful commands, and when the police pushed the crowd away, she left.  It must be true that the Court, given its familiarity with January 6 cases,  has seen instances in which protesters resisted vigorously, even violently and criminally, efforts by the police to move people from the Capitol and its grounds.

      The Court is aware of the difficulties not of her own making the defendant has encountered in her life: a mother whose own problems kept her from being able to raise her children; being reared, then adopted at the age four, by her grandparents;  living in the grandparents' home with other relatives, one of  whom abused the defendant when she was at a tender age; surviving a bad first marriage, then finding another mate, having children with him,

---

[5]The defendant disputes that the term "rioter" should apply to her, for the reasons given *supra.*

only to lose him to brain cancer a mere five years after they married; experiencing trouble with alcohol, then getting it under control. (PSR, p. 13, §§58-63) But the defendant persisted, as a single mother, working and raising her children, her oldest reporting that "his mother always provided for (us) and did the best she could." (PSR, p. 13, ¶63) And she has contributed to her church, to which she has belonged for twenty years and where she teaches Sunday school. There is much that is admirable about the defendant.

She has been employed in her current job for most of the past twelve years. It is one that provides her with both financial support and personal satisfaction. There, she has been recognized with commendations for her conscientious work. Outside of work, she has a sense of civic duty, is active in her church, and feels a responsibility to her country.

The defendant seeks a sentence of probation with these conditions: (1) home confinement or intermittent confinement consisting of weekends in jail, so that, in either case, she will be able to keep her job,[6] which is so valuable to her will not be jeopardized; (2) one hundred twenty (120) hours of community service;[7] and (3) restitution of $500, to which she has already agreed in her plea agreement.[8]

Under 18 U.S.C. §3553(a) the following factors: (a) Factors To Be Considered in Imposing a Sentence. - The court shall impose a sentence sufficient, but not greater than

---

[6] She works Monday through Fridays, and must be on site, not in a remote location, to discharge her responsibilities.

[7] The government has requested sixty hours. However, the defendant, to demonstrate to the Court her *bona fides*, as well as the regret and remorse she feels for her conduct. Thus, she is prepared to make a greater contribution to the community.

[8] The PSR notes that it has insufficient information on which to advise the Court on whether or not the defendant has the means with which to pay a fine. Given the substantial amount of information the defendant has already provided, and noting that the probation office did not itself obtain corroboration of income from the IRS, the defendant submits the Court has sufficient evidence not to impose a fine. (PSR, "Financial Condition: Ability to Pay," pages 16-17, ¶¶88-95)

necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider - (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner….

The sentence the defendant suggests will serve the ends the Court must consider. The sentence will reflect the seriousness of the offense; much will be demanded of her, and the conviction itself, not expungeable, will remain throughout her life. Both specific and general deterrence will be served. It is simply overstatement for the government to contend that a danger of recidivism for "acts of political extremism" exists when the defendant's conduct was itself not an act of extremism but rather an instance of poor judgment getting the best of her in a moment of agitation and high excitement.[9] (Govt. Memo, page 8)  But the defendant has learned an valuable lesson from this experience, one that will act as a brake on her future behavior, thereby "protect(ingt) the public from further crimes…"  The very arrest, prosecution, and conviction, followed by sentencing, will have the effects they are meant to have.

---

[9] The government warns that the danger of recidivism is high when "...defendants who have been sentenced…continue to propagate the same visceral sentiments which motivated the attack," The record of this case does not include evidence that the defendant has propagated such sentiments, before, during, or after the January 6 episode. (Id.)

The defendant submits that, in these circumstances, the government's recommendation of forty-five (45) days of incarceration is not supportable.[10]  Certainly it is making its arguments in good faith, but the defendant submits that they do not take into account other factors that are more compelling.

For all the reasons noted above, the defendant respectfully requests a sentence of two (2) years probation, with either home or intermittent confinement as a condition of probation, 120 hours of community service, and $500 in restitution.

This pleading is,

Respectfully submitted,

/s/

NATHAN I. SILVER, II
Unified Bar #944314
6300 Orchid Drive
Bethesda, MD 20817
(301) 229-0189 (direct)
(301) 229-3625 (fax)
email: nisquire@aol.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served via ECF upon Adam M. Dreher, Esq., USDOJ-AUSA detailee, attorney of record for the government, this 13th day of June, 2024, and Kira Anne West, Esq., attorney for codefendant Xyan Clary.

/s/
_____
*Nathan I. Silver, II*

---

[10] The defendant does not oppose the government's recommendation of two years probation.